# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ANTHONY LAMONTE CROOM,

                     Petitioner,               :    Case No. 3:14-cv-439

     - vs -                                     District Judge Walter Herbert Rice
                                              Magistrate Judge Michael R. Merz

MICK OPPY, Warden,

                                         :
               Respondent.

# REPORT AND RECOMMENDATIONS

This is a habeas corpus case brought *pro se* pursuant to 28 U.S.C. §2254 by Petitioner Anthony Lamonte Croom to obtain relief from his convictions in the Montgomery County Common Pleas Court on charges of aggravated murder, murder, murder as a result of felonious assault, and two counts of felonious assault; each count carried a firearm specification. He was sentenced to life imprisonment without the possibility of parole and seeks his release.

Croom pleads the following claims for relief:

> **Ground One:** Petitioner was denied due process when the evidence against him was constitutionally insufficient.
>
> **Supporting Facts:** The State of Ohio failed to present sufficient evidence to prove that petitioner was in any way responsible for victim's death.
>
> **Ground Two:** Petitioner was denied due process when out-of-court identification of petitioner should have been suppressed.
>
> **Supporting Facts:** The photo line-up was suggestive when the detective in this case altered the lineup by folding a piece of paper to cover the hats of the alleged suspects.

1

**Ground Three:**  Petitioner was denied due process when the statements he made during the course of plea negotiations were used against him.

**Supporting Facts:**  Petitioner spoke with law enforcement and refused to sign a waiver of rights form.  The petitioner had an expectation that a plea was being negotiated at the time of the conversation.

**Ground Four:**  Petitioner was denied his Sixth Amendment right to the effective assistance of counsel.

**Supporting Facts:**  Trial counsel made numerous errors during the course of his representation of petitioner.

**Ground Five:**  Croom's [sic] was denied due process of law when hearsay testimony of alleged co-conspirators was allowed.

**Supporting Facts:**  The trial court allowed certain hearsay testimony to come in based on the alleged conspiracy arising out of Anthony Hurd's murder.  Specifically, the court allowed Latisha Walker to testify regarding conversations she had with Billy Hicks and Tyree Smith, and Heather Clark to testify about conversations she had with Rollie Mitchell, without neither [sic] Hicks, Smith, nor Mitchell testifying at defendant's trial.

**Ground Six:**  Croom's [sic] was denied due process of law when the trial court took two of State's witnesses as its own witnesses pursuant to Evidence Rule 614(A).

**Supporting Facts:**  The State moved that two of it's [sic] witnesses, Jamilla Jones and Heather Clark, be taken as court's witnesses for the reason that Jamilla Jones was dating the Defendant at the time Hurd was murdered, and that Heather Clark had an on-going romantic relationship with Rollie Mitchell for years.  However, it is error to declare an individual as a court witness solely for the purpose of allowing the party calling that witness to impeach the credibility of its own witness by means of a prior inconsistent statement.

**Ground Seven:**  Croom's [sic] was denied due process of law due to prosecutorial misconduct.

**Supporting Facts:**  Prosecutor's improper remarks during closing arguments attempted to shift the burden of proof to Croom which amounted to prosecutorial misconduct.

(Petition, Doc. No. 1, PageID 5-14.)

Upon preliminary consideration pursuant to Rule 4 of the Rules Governing §2254 Cases, the Court ordered Respondent to file an answer which he has done (Return of Writ, Doc. No. 6). The Court also set a date for Croom to file a reply and extended that time twice, but Croom has failed to do so.

**Procedural History**

In 2010 a Montgomery County grand jury indicted Croom on charges of aggravated murder, two counts of murder, and two counts of felonious assault, all with firearm specifications, arising out of the killing of Anthony Hurd, a cooperating informant of the Drug Enforcement Administration.  At trial a jury found Croom guilty of all counts and specifications. After his *pro se*  motion for new trial was denied, Croom was sentenced to life imprisonment without the possibility of parole.  He then appealed to the Second District Court of Appeals which affirmed on all assignments of error relevant here.  *State v. Croom*, 2013-Ohio-3377, 2013 Ohio App. LEXIS 3454 (2nd Dist. Aug. 2, 2013).[1]  The Ohio Supreme Court declined jurisdiction over a further appeal.  *State v. Croom*, 137 Ohio St. 3d 1424 (2013).  Croom then filed this habeas corpus action *pro se*  on December 9, 2014.

---

[1] References in this Report to "State v. Croom" are to this decision rather than the Ohio Supreme Court's denial of review.

# Analysis

## Ground One for Relief: Insufficient Evidence

In his First Ground for Relief, Croom claims generally that his convictions are supported by insufficient evidence, without specifying any particular respect in which the convictions fall short.

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007). This rule was recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.*

4

In cases such as Petitioner's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009).  In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008); *accord Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011)(en banc).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."

5

> *Cavazos v. Smith,* 565 U. S. 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (*per curiam*). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U. S. ___, ___, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2062, (2012)(*per curiam).*

This claim was presented as Croom's Fourth Assignment of error on direct appeal and decided by the Second District along with his Third Assignment claiming the verdicts were against the manifest weight of the evidence.  Judge Fain wrote for the Second District:

> **[\*P34]** Croom's Third and Fourth Assignments of Error are:
>
> THE JURY'S VERDICTS SHOULD BE REVERSED AS THEY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S MOTION FOR ACQUITTAL SINCE THE STATE FAILED TO SUPPLY SUFFICIENT EVIDENCE AS TO ALL THE ELEMENTS NECESSARY TO SUPPORT THE CHARGES AGAINST THE DEFENDANT.
>
> **[\*P35]** In support of these assignments of error, Croom argues that the testimony of Hoover and "two jailhouse snitches, Damon Lewis and Latell Mays, is simply not believable by any objective standard."
>
> **[\*P36]** A sufficiency-of-the-evidence argument challenges whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61

Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

[*P37]  The analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1st Dist.1983).

[*P38]  Hoover identified Croom as the person who fired several shots into a vehicle at the gas station.

[*P39]  Damon Lewis was incarcerated with Croom in 2008. Lewis was serving a 43-year sentence for Possession of Cocaine, Possession of Marijuana with a Habitual Offender classification. He also had two prior convictions for Possession of Cocaine. According to Lewis, Hurd was "best" friends with Lewis's sister and Hurd had grown up with Lewis. Lewis also "grew up" with Rollie Mitchell. Lewis testified that he knew Tyree Smith and Billy Hicks through the drug trade. Lewis testified that he came to know Croom as "Boogie" while in prison. He testified that he and Croom became "pretty close," and that over time they began to discover that they both knew Mitchell, Smith and Hicks. They also began to discuss the Hurd murder. Lewis testified that Croom told him that Mitchell offered him money to kill Hurd, but that he did not take the offer until Mitchell "threw in a Cadillac." Croom told Lewis that before the killing he met with Billy Hicks to finalize the details. Lewis testified that Croom admitted to traveling "two to three exits into Ohio" and then shooting Hurd eight or ten times with his weapon of choice, a .40 caliber weapon. Croom told Lewis that "Big Frank" was the only person who could say for certain that he had committed the killing. Finally, Lewis testified that he was contacted by investigators regarding his knowledge of the crime, and that he was not given any offers or inducements to testify

7

[**\*P40**]  Latell Mayes also became acquainted with Croom while they were incarcerated together in 2010. Mayes was in prison serving a fifty-year sentence as a Habitual Offender dealing in Cocaine. Mayes testified that he was close to Hurd, and that Mitchell is his cousin. He also testified that he knows Hicks. Mayes testified that when he and Croom became acquainted, he told Croom that he was Mitchell's cousin. Croom told Mayes that he met Mitchell through his cousin "Q" [Quentin Cheshier], and that Mitchell had given Croom a red Cadillac that he had to eventually get rid of because it had become "too hot." Croom further told Mayes that he had killed "little Tony" in exchange for money and the Cadillac. According to Mayes, Croom confessed that he and Big Frank drove to Dayton and that he shot Hurd eight times with a .40 caliber weapon. Mayes testified that he told his brother to contact the police for him so that he could inform them of Croom's statements. He testified that he received no promises or benefits in exchange for his testimony.

[**\*P41**]  The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the finder of fact to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

[**\*P42**]  Croom claims that it is "highly suspicious" that the State just happened to find two people who knew Hurd and the other people involved in this incident. He further claims that the testimony of Mayes and Lewis is made even more suspect by the fact that they did not approach law enforcement, but were, instead contacted by investigators.

[**\*P43**]  Mayes and Lewis were involved in the drug trade in Richmond, Indiana, and as a result were familiar with many of the individuals involved in hiring Croom. Indeed, Mayes testified that he is related to Mitchell, but he nevertheless testified that Mitchell gave Croom payment for the killing. That both Lewis and Mayes were also close friends of Hurd is not all that surprising, given the apparent close ties between the individuals involved in the Richmond drug trade. The testimony of Mayes and Lewis is not inherently incredible. We conclude that the jury did not lose its way in crediting their testimony, along with Hoover's, in reaching its verdict.

[**\*P44**]  In sum, the testimony of Hoover, Mays and Lewis constitutes sufficient evidence upon which a reasonable juror could rely in finding that Croom shot and killed Hurd; upon this record, the jury did not lose its way in so finding; and this is not the rare

> case in which a manifest miscarriage of justice has occurred. We conclude therefore that the State presented sufficient evidence to support the conviction, and that the conviction is not against the manifest weight of the evidence. Croom's Third and Fourth Assignments of Error are overruled.

*State v. Croom, supra.*

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785 (2011); *Brown v. Payton*, 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).

The Second District's denial of Croom's Fourth Assignment of Error is completely consistent with *Jackson v. Virginia*, 443 U.S. 307 (1979); *State v. Jenks, supra*, embodies the federal standard. The facts recited from the evidence are sufficient to support the conviction. Croom's First Ground for Relief is therefore without merit.

**Ground Two:  Failure to Suppress Out-of-Court Identification**

In his Second Ground for Relief, Croom claims he was denied due process of law when out-of-court identifications were admitted against him. In his supporting facts, he claims a line-up was suggestive because a detective used a piece of paper to cover up the hats of those in the photographic lineup. This was Croom's First Assignment of Error on direct appeal. The Second District decided it as follows:

[**\*P8**] Croom's First Assignment of Error is as follows:

9

THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO SUPPRESS AN OUT-OF-COURT IDENTIFICATION OF THE APPELLANT.

 **[\*P9]** Croom contends that the trial court should have suppressed the identification testimony of Lindsay Hoover, who was an eyewitness to the shooting. In support, he argues that her identification of him from a photographic array was not reliable, because: 1) it was made three years after the crime was committed; 2) the photograph of Croom shows him with his eyes wider than any of the other individuals in the array; 3) Croom's photograph has a blue background not found in any of the other photographs; 4) Croom's photograph is "noticeably larger" than the others; 5) Hoover took 30 to 45 seconds to make the identification as being photograph number one or three (Croom's picture was in the number three position), and did not make a positive identification until the officer questioning her created a "paper hat" to place on the head of each individual; and 5) Hoover's testimony regarding the offense demonstrated that her identification was suspect.

 **[\*P10]** Due process requires suppression of an identification, whether made in or out of court, if the confrontation procedure was "unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances." (Citation omitted.) *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004 Ohio 3570, ¶ 19. "In the context of eyewitness identification testimony, an impermissibly suggestive identification procedure will be suppressed due to the substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Marbury*, 10th Dist. Franklin No. 03AP-233, 2004 Ohio 3373, ¶ 56.

 **[\*P11]** Admissibility hinges upon the reliability of the identification and is determined from the totality of the circumstances, "which includes the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated, and the time between the crime and the identification procedure." (Citations omitted.) *State v. Robinson*, 2d Dist. Montgomery No. 17393, 2001 Ohio App. LEXIS 238, 2001 WL 62569, \*6 (Jan. 26, 2001).

 **[\*P12]** At the suppression hearing, Englewood Detective Alan Meade testified that he created the photographic array using the

10

Ohio Bureau of Motor Vehicles drivers licensing database as well as the OLEG system maintained by the Ohio Attorney General's office. Meade testified that he used the system to "generate a photo spread using people that are like and similar in age, height and weight to Mr. Croom. And that system randomly pulls photos up of individuals that have likeness and similarities. And then I printed out those photos." Because Croom did not have a photo license in Ohio, Meade obtained a photograph from the Indiana Bureau of Motor Vehicles, which he then added to the array. Meade placed Croom's picture in the third position out of six pictures.

[*P13]  Meade then arranged to meet with eyewitness Lindsay Hoover in order to show her the photographic array. Hoover lived in Columbus, so Meade met her in Columbus in a church parking lot. Hoover was alone when she met with Meade. Meade read the following instructions to Hoover prior to showing her the array:

> I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hair styles, beards and moustaches may be easily changed. Also, photographs may not always depict the true complexion of a person: it may be lighter or darker than shown in the photo. Pay no attention to any markings or numbers that may appear on the photos or any other differences in the type or style of the photographs. When you have looked at all the photos, tell me whether or not you see the person who committed the crime. Do not tell other witnesses that you have or have not identified anyone.

 [*P14]  Within approximately thirty seconds, Hoover stated that the shooter was either the individual in photograph number one or number three. She informed Meade that the shooter had been wearing a baseball cap at the time of the offense, and that she "knew it was either one or three and that she wanted to make sure that she picked the right person." Meade then took a plain sheet of paper and placed it across the tops of the heads of the three individuals pictured in the top row of the array (photographs number one, two and three). Within "ten to twenty" seconds, Hoover identified photograph number three as the shooter, stating that she would "never forget what his eyes looked like." Hoover and Meade both signed the instruction page on the back of the array.

[*P15]  Croom contends that the array was unduly suggestive. After examining the array, we reject Croom's contentions that his photograph is larger than the other photographs in the array and that his eyes appear wider than the eyes of the individuals in the five other photographs. Croom also argues that his photograph has a blue background not found in the other pictures. We conclude that this does not render the array unduly suggestive — all of the photographs have backgrounds varying in shades of blue to lavender. Although Croom complains that Meade manipulated the photos in the array by placing a piece of paper over them, the record reveals that he did so uniformly with respect to the top three photographs that included the two remaining after Hoover had eliminated the other four as possibilities. And Meade's purpose was to simulate the effect of the baseball cap that Hoover said the perpetrator was wearing.  There is nothing in the record to suggest that this was done in a suggestive manner. We find nothing suggestive about the array, and we do not find Meade's placement of the paper across the top three photographs to have been unduly suggestive.

[*P16]  Croom also contends that Hoover's identification of him was stale, having occurred three years after the offense. We agree that in this context, three years is a long time, but Hoover was able to identify Croom as the shooter in about a minute. Furthermore, Hoover was able to observe Croom during the shooting, and as he crossed in front of the vehicle in which she was seated, Hoover and Croom stared at each other. Hoover had an unobstructed view of the crime and of Croom, and due to the shocking nature of the crime, she was able to recall the details of the shooting. We conclude that the trial court did not err in finding that the lapse of time did not render Hoover's identification so unreliable as to violate due process and warrant suppression under *Neil v. Biggers, supra*.

[*P17]  Croom contends that Hoover's trial testimony regarding her identification and her observation of the offense demonstrate that her identification was unreliable. Specifically, Croom cites the fact that Hoover testified that the victim got into the driver's side of his vehicle; that the shooter was wearing a red baseball cap; that shots were fired from both the driver's side and the passenger's side of the vehicle; and that the shooter walked right in front of Hoover's vehicle, where she was able to look him in the eye. Croom argues that the video of the shooting and "other testimony elicited at trial" refute all of Hoover's testimony.

[*P18]  The trial court did not have Hoover's trial testimony

before it when it decided the motion to suppress. The only evidence before the trial court was her testimony at the suppression hearing. A trial court does not err by deciding a motion to suppress based upon the evidence presented at the suppression hearing. The record does not indicate that Croom renewed his motion to suppress following Hoover's trial testimony. Thus, the trial court was not given the opportunity to reconsider the suppression issue in the light of the evidence presented at trial.

 [*P19]  Even if the trial court had reconsidered the suppression issue in the light of the evidence presented at trial, we would find no error. Discrepancies between Hoover's suppression hearing testimony and the evidence admitted at trial were for the jury to consider in evaluating her credibility and the weight to be given to her testimony, but would not inherently render her identification so unreliable as to warrant suppression.

 [*P20]  The video of the shooting does not refute Hoover's claim that the shooter was wearing a baseball cap; the video is dark and does not clearly establish that the shooter had nothing on his head. Although the other eyewitness to the shooting did testify that the person with a gun did not have on a hat, she admitted that she was in the back of the store when the shooting occurred, and she merely glimpsed a man with a gun outside the store for a matter of a few seconds. The jury could reasonably find that Hoover had the better view of the shooter, since the shooter walked right in front of her car.

[*P21]  Hoover did not, as Croom claims, testify that Hurd got into the passenger side of his vehicle. Her testimony indicated that the victim's vehicle was traveling through the parking lot during the entire time she observed the shooting. We find nothing in the record to rebut Hoover's claim that the shooter walked in front of her car after the shooting.

 [*P22]  At the suppression hearing, Hoover did testify that the shooter was shooting into the driver's side of the victims' vehicle, but at trial she testified that Croom was actually shooting into the passenger's side of the vehicle. Hoover admitted that she had made a misstatement with regard to her suppression hearing testimony, and said that she realized her misstatement as soon as she left the suppression hearing. She testified that she immediately made note of the error to her father. While this discrepancy between Hoover's trial and suppression hearing testimony, which she acknowledged and explained as being the result of a misstatement at the suppression hearing, is a legitimate matter for the jury to have

13

considered in evaluating her credibility and the weight to be given her testimony, it did not render her identification testimony so unreliable as to warrant suppression.

[*P23] Croom's First Assignment of Error is overruled.

*State v. Croom, supra.*

The Warden argues that Croom's Second Ground for Relief is procedurally defaulted because Croom did not renew at trial his claim that Hoover's identification was unconstitutionally suggestive.

The procedural default doctrine in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional rights claim he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000)(citation omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 110; *Wainwright*, 433 U.S. at 87. *Wainwright* replaced the "deliberate bypass" standard of *Fay v. Noia*, 372 U.S. 391 (1963). *Coleman*, 501 U.S. at 724.

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a

habeas claim is precluded by procedural default. *Guilmette v. Howes,* 624 F.3d 286, 290 (6th Cir. 2010)(*en banc*); *Eley v. Bagley*, 604 F.3d 958, 965 (6th Cir. 2010); *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594, 601-02 (6th Cir. 2001); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> . . . .
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin*, 785 F.2d at 138; accord, *Hartman v. Bagley,* 492 F.3d 347, 357 (6th Cir. 2007), *quoting Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002).

The Warden notes that Croom did not make a contemporaneous objection to admission of Hoover's identification at trial. It is not clear, however, that the Second District enforced this procedural default against Croom because it does not mention the contemporaneous objection rule and proceeds to a merits analysis without also mentioning the plain error doctrine. Had it done so, the procedural default would be clear, but the safer course is for this Court to consider the merits.

On the merits, Croom has made no showing that the Second District's decision on his First Assignment of Error was contrary to or an objectively unreasonable application of the governing Supreme Court precedent, *Neil v. Biggers, supra*. It is therefore respectfully recommended that the Second Ground for Relief be denied on the merits.

**Ground Three: Unconstitutional Use of Statements Made During Plea Negotiations**

In his Third Ground for Relief, Croom asserts that his statements to police were unconstitutionally used against him because, at the time the statements were made, he had an expectation that a plea was being negotiated.

Croom has made no argument in support of this Ground for Relief. The Court therefore assumes he is making the same argument here that he made in the Second District. As the Warden points out, if he were making a different argument here, his claim would not have been fairly presented to the Ohio courts and would therefore be procedurally defaulted.

As the claim was presented to the Ohio courts, it does not state a claim upon which habeas corpus relief can be granted. To put it simply, the Constitution does not forbid the use at trial of incriminating statements made by a defendant to the police on the basis that the defendant believed he was negotiating a plea.

Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Wilson v. Corcoran,* 562 U.S. 1 (2010); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982); *Barclay v. Florida,* 463 U.S. 939 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Ground Three should be dismissed for failure to state a federal constitutional claim.


**Ground Four:  Ineffective Assistance of Trial Counsel**


In his Fourth Ground for Relief, Croom asserts his Sixth Amendment rights were violated by ineffective assistance of trial counsel.  The claim is very vague – trial counsel is asserted to have committed "numerous errors," none of which are specified.

Ineffective assistance of trial counsel was Croom's Fifth Assignment of Error on appeal which the Second District decided as follows:

> **[*P45]**  Croom's Fifth Assignment of Error states as follows:
>
> APPELLANT WAS DENIED HIS CONSTITUTIONALLY GUARANTEED RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL MADE NUMEROUS ERRORS DURING THE COURSE OF HIS REPRESENTATION OF APPELLANT.
>
> **[*P46]**  Croom contends that his trial counsel was ineffective because counsel failed: 1) to retain an eyewitness expert; 2) to file a notice of alibi; 3) to object to calling Heather Clark as a Court's witness; 4) to object to the introduction of Tiffany Brewer's cellular telephone records; 5) to object to the rebuttal testimony of Detective Meade regarding Croom's statement that he could "hypothetically" give information regarding who committed the murder; 6) to object to the introduction into evidence of a gun taken from Croom during an unrelated arrest; and 7) to object to hearsay testimony regarding the conspiracy to kill Hurd.
>
> **[*P47]**  In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Trial counsel is entitled to a

strong presumption that his conduct falls within the wide range of effective assistance, and to show deficiency, the defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness." *State v. Matthews*, 189 Ohio App.3d 446, 2010 Ohio 4153, 938 N.E.2d 1099, ¶ 39 (2d Dist.).

 **[\*P48]**  We begin with the complaint that counsel failed to retain an expert on eyewitnesses. In 2011, Croom's former attorney sought, and was given, authorization by the trial court to "obtain the services of an Eye Witness Identification expert out of Powell, Ohio." Croom claims that "such an expert was necessary due to the questionable identification by Ms. Hoover that was going to be allowed at trial as a result of the trial court's ruling on Defendant's Motion to Suppress Identification. There is no indication in the record that defense counsel ever did anything with this authorization."

**[\*P49]**  We agree that there is nothing in the record indicating that counsel "did anything" with this authorization. But there is also nothing in the record to establish that trial counsel did not do anything to seek the services of an expert. On direct appeal, it is the duty of the appellant to portray error in the record, even when that error is alleged ineffectiveness of trial counsel. Because the record in the trial court, before judgment, is seldom made up on the issue of the effective assistance of trial counsel, it is often difficult for a criminal defendant to establish ineffective assistance of trial counsel in a direct appeal, or, for that matter, for the State to establish the contrary. [FN 1 Seemingly questionable conduct by defense counsel may have a good explanation, but the State has no opportunity at trial to discover, much less to prove, that there is a valid reason for defense counsel's conduct.] In the case before us, it may be that counsel determined that the expert was not going to provide any testimony that would help Croom. Or it may be that counsel did not want to keep reminding the jury a neutral witness saw the shooting and identified Croom as the shooter. Indeed, it appears from statements made by counsel  in chambers that he did not wish to bring up the eyewitness testimony, except to attack it during closing argument. In any event, we cannot say that there is anything in this record to support Croom's claim that counsel was ineffective in this regard.

 **[\*P50]**  Next, Croom complains that counsel failed to set forth a notice of alibi, thus preventing him from testifying thereto. Croom notes that counsel stated, again in chambers, that he did not file a Notice of Alibi, because "there was no notice of alibi to file." Croom contends that such a statement is "nonsensical."

[**\*P51**]  A review of the record shows that, in chambers, trial counsel advised the trial court and the prosecutor that Croom intended to testify against counsel's advice. As part of that discussion, counsel stated that he did not file any notice of alibi, because there was no notice of alibi to file. It appears from the record that Croom advised counsel that he was going to testify, despite counsel's advice, and that he intended to testify that he had an alibi. One possibility, which the record of this direct appeal cannot gainsay, is that Croom had admitted to his trial counsel that he had no alibi — that he was in the general vicinity, at least, of the shooting, in which event defense counsel could not ethically offer Croom's perjured testimony concerning an alibi. This would be consistent with defense counsel's having told the trial court that "there was no notice of alibi to file."

[**\*P52**]  Again, there is nothing in this record to indicate that Croom had an alibi to put forth. Furthermore, the record suggests that counsel was not aware of any potential alibi until Croom notified him that he intended to testify. Given the state of the record, Croom has failed to portray error in this regard.

[**\*P53**]  Croom also contends that counsel was ineffective for failing to object to the State's request to call Heather Clark as a court's witness. He argues that the State did not point to any reason to suggest that Ms. Clark had been uncooperative, thereby necessitating calling her pursuant to Evid.R. 614(A). As set forth in Part VIII, below, we conclude that calling Clark as a court's witness was not error. Therefore, we conclude that counsel was not ineffective for failing to object thereto.

[**\*P54**]  Croom next argues that counsel was ineffective for failing to object to the introduction of Tiffany Brewer's cellular telephone records "when [she] never testified who else may have been in possession of her phone in July and August 2007."

[**\*P55**]  A review of the record reveals that DEA agent Gaertner testified that Brewer was in possession of her phone at the time she went to the hospital following the shooting and investigators took it from her. He further testified Brewer's cell phone records, obtained by subpoena, revealed that on August 2, 2007, between 12:25 a.m. and 2:17 a.m., there were seventeen calls between Brewer's cell phone and a phone known to be used by Billy Hicks.

[**\*P56**]  We find no basis for an objection by counsel. The evidence demonstrates that Brewer had the telephone in her

possession when she and Hurd were shot. There is nothing to suggest that anyone else was in possession of the phone during the time in question.

[*P57]  We next turn to the claim that counsel was ineffective for failing to object to the rebuttal testimony of Detective Meade with regard to the statement made by Croom to investigators regarding his "hypothetical" knowledge of the crime. During trial, Croom took the stand in his own defense. Upon cross-examination, the State asked Croom whether he had told Latell Mays or Damon Lewis, individuals with whom he had been incarcerated, that he killed Hurd. Croom answered negatively. The State then asked whether he "told other people that [he] was involved in this conspiracy to murder Tony Hurd." Croom again answered in the negative. The prosecutor then asked if he recalled speaking to investigators on December 16th, 2008, to which he responded, "Yes."

[*P58]  At that point, defense counsel objected, arguing that the statement could not be admitted, because it was made during a plea negotiation, citing Evid.R. 410. The trial court heard arguments on the matter in chambers, but ultimately ruled that the statements made to the investigators were not barred by Evid.R. 410. Thereafter, the State brought Detective Meade to the stand as a rebuttal witness. Meade testified that Croom made the statement that he could "hypothetically" tell Meade who committed the crime.

[*P59]  We note that our review of the record indicates that counsel did object to the use of the statement. Furthermore, with regard to Meade's rebuttal testimony, counsel asked for a limiting instruction to the jury that the testimony could not be considered as evidence of guilt, but could only be used for the purpose of considering Croom's credibility. There was no basis for arguing that Croom's statements were made in the course of plea negotiations. We find no ineffective assistance of counsel in this regard.

[*P60]  Croom also argues that counsel was ineffective because he failed to object to the admission of a gun found on Croom when he was stopped by police on an unrelated matter. Specifically, the State presented the testimony of Indianapolis Officer Charles Tice, who stated that in 2007 he was on patrol in Indianapolis when he observed "a black male on all fours behind a gray Dodge truck [who] appeared to be throwing up." Tice stopped to check on the man, who turned out to be Croom, when Croom stood up and tried

to run away. Ultimately, Croom was arrested, and Tice recovered a .40 caliber Glock 22 gun from Croom. The gun was introduced in evidence without objection. However, we cannot say that counsel was ineffective. Although this gun was excluded as the gun that was used to shoot Brewer and Hurd, the shells recovered at the scene from the murder weapon were .40 caliber, and the .40 caliber Glock 22 gun found on Croom's person corroborated the testimony of Damon Lewis that Croom had admitted to Lewis that a .40 caliber firearm was Croom's weapon of choice, and what Croom had been carrying whenever he got caught with a gun.

[*P61]  Finally, Croom contends that counsel was ineffective for failing to object to statements made by co-conspirators regarding the conspiracy to murder Hurd. Specifically he objects to the testimony of Heather Clark, Latisha Walker and DEA Agent Gaertner.

[*P62]  Counsel initially objected to these statements by claiming that the State had not presented a prima facie case of conspiracy. Counsel did make objections during the testimony of each witness cited by Croom. Thus, we find no ineffective assistance of counsel. Furthermore, as discussed in Part VII, below, the testimony was properly admitted. Thus, we find this argument to be without merit.

[*P63]  Croom's Fifth Assignment of Error is overruled.

*State v. Croom, supra.*

Again we assume Croom is presenting the same claims of ineffective assistance of trial counsel here as he presented to the Ohio courts, because any other claims would be procedurally defaulted.  The Second District decided this claim on the merits and applied the correct federal standard found in *Strickland v. Washington, supra*.  Nothing in the Second District's decision suggests it is contrary to or an objectively unreasonable application of *Strickland*;  such claims are very difficult to sustain in habeas corpus.  *Harrington v. Richter*, 562 U.S. 86, 105 (2011); *Burt v. Titlow*, 134 S. Ct. 10, 15-16 (2013).  Croom's Fourth Ground for Relief should therefore be denied on the merits.

21

**Ground Five:  Denial of Due Process by Admission of Hearsay Testimony of Alleged Co-conspirators**

In his Fifth Ground for Relief, Croom claims he was denied due process of law when the trial court allowed hearsay statements by Billy Hicks, Tyree Smith, and Rollie Mitchell.

As the Warden notes, this claim was presented to the Second District purely as an Ohio evidentiary claim, to wit, that admission of the statements of alleged co-conspirators violated the Ohio evidence rule against the admission of hearsay.  The Second District decided the question purely in terms of the Ohio evidentiary exception to hearsay exclusion which arises when the proponent provides adequate independent proof of the existence of a conspiracy.  To the extent Croom now makes a federal constitutional claim, it is procedurally defaulted for failure to fairly present it to the Ohio courts.  To the extent he asks this Court to review the Second District's evidentiary decision, that is beyond the competence of a federal habeas court.

Evidentiary questions generally do not rise to the constitutional level unless the error was so prejudicial as to deprive a defendant of a fair trial.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988);  *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir. 1983);  *Bell v. Arn,* 536 F.2d 123 (6th Cir. 1976); *Burks v. Egeler*, 512 F.2d 221, 223 (6th Cir. 1975). Where an evidentiary error is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief. *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007); *Bugh v. Mitchell,* 329 F.3d 496 (6th Cir. 2003), *citing Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2000).  Courts have, however, defined the category of infractions that violate fundamental fairness very narrowly.  *Bugh, quoting Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)(*quoting Dowling v. United States*, 493 U.S. 342, 352 (1990)).  "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted

in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker,* 224 F.3d  542, 552 (6th Cir. 2000)(*quoting Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  The Supreme Court has defined very narrowly the category of infractions that violate fundamental fairness.  *Bey v. Bagley*, 500 F.3d 514 (6th Cir.  2007), *citing Dowling*, 493 U.S. at 352 (Identification from a trial which resulted in an acquittal could be introduced at second trial for similarities.)  "There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh,* 329 F.3d at 512, noting that the Supreme Court refused to reach the issue in *Estelle v. McGuire*. 502 U.S. 62 (1991).

Ground Five should also be dismissed.


## Ground Six:  Denial of Due Process by Designating Witnesses as Court Witnesses


In his Sixth Ground for Relief, Croom asserts he was denied due process of law when the trial court allowed Jamilla Jones and Heather Clark to be designated as court's witnesses so that they could be impeached by the State.

As the Warden notes, this claim was presented to the Second District Court of Appeals as an abuse of discretion claim under Ohio R. Evid. 614.  Thus it is procedurally defaulted as it was never presented to the Ohio courts as a federal constitutional claim.  Moreover, a claim that a state court judge abused his or her discretion does not state a claim for relief under the United States Constitution.  *Sinistaj v. Burt,* 66 F.3d 804 (6th Cir. 1995).

Croom's Sixth Ground for Relief should be dismissed.

**Ground Seven:  Prosecutorial Misconduct**


In his Seventh Ground for Relief, Croom asserts he was denied a fair trial by prosecutorial misconduct by the prosecutor's effort in closing argument to shift the burden of proof.  This claim was presented to the Second District as Croom's Eighth Assignment of Error on direct appeal and decided as follows:

> [*P79]  Croom's Eighth Assignment of Error provides:
>
> THE PROSECUTOR'S IMPROPER REMARKS DURING CLOSING ARGUMENT ATTEMPTING TO SHIFT THE BURDEN OF PROOF TO THE APPELLANT AMOUNTED TO PROSECUTORIAL MISCONDUCT.
>
> [*P80]  Croom complains that the prosecutor improperly commented upon the burden of proof thereby rendering the trial unfair.  Specifically, after closing argument by the defense, the prosecutor made the following statement:
>
>> * * * There were some statements made during Defense counsel's closing, some comments on the fact that the State may have not called certain witnesses. I think there was a mention of Brenda Cheshier, the defendant's beloved aunt. He talked about vehicle titles or BMV records. Also, there was a mention of someone who could come forward and produce a photo of this truck. This Dodge Ram truck.
>
> Although the defendant has no burden of proof in this case; he does not have to prove anything. Make no mistake, he still has the same subpoena power as the State of Ohio. He's free to call witnesses and bring them into court and have them testify, and produce records, if he so chooses, that would support his theory of the case.
>
> [*P81]  During his closing argument, defense counsel had made statements to the effect that the State did not call his aunt, Brenda Cheshier, to the witness stand to testify that the Cadillac had been given to him as a payment for killing Hurd. He further made reference to the fact that the vehicle records show that his aunt had

owned the Cadillac and that the car had been put into his girlfriend's name. Counsel further stated that there were no pictures of Croom's truck to compare to the descriptions of the getaway truck.

[*P82] "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. In making this determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist.1995). Moreover, the closing argument must be viewed in its entirety to determine whether it is prejudicial. *State v. Moritz*, 63 Ohio St.2d 150, 157, 407 N.E.2d 1268 (1980).

[*P83] Croom did not object to the above-cited passage in the prosecutor's rebuttal closing argument, and therefore failed to preserve this issue for review. In any event, we find no misconduct. A "comment that a witness other than the accused did not testify is not improper, * * * since the prosecution may comment upon the failure of the defense to offer evidence in support of its case." *State v. Clemons*, 82 Ohio St.3d 438, 452, 1998 Ohio 406, 696 N.E.2d 1009, 1022 (1998).

[*P84] We find no attempt in the prosecutor's closing argument to shift the burden of proof to the defendant. The State merely, and properly, replied to defense counsel's intimation that the State's failure to offer the testimony of Croom's aunt supported an inference that her testimony would have been favorable to him, by pointing out that Croom could have offered her testimony if it was, in fact, favorable to the defense on the issue of the Cadillac as payment for the murder.

[*P85] The Eighth Assignment of Error is overruled.

*State v. Croom, supra.*

The Sixth Circuit has articulated the relevant standard for habeas claims of prosecutorial misconduct:

On habeas review, claims of prosecutorial misconduct are reviewed deferentially. *Darden v. Wainwright*, 477 U.S. 168, 181

(1986). To be cognizable, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. (citation omitted). Even if the prosecutor's conduct was improper or even "universally condemned," *id*., we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair. Once we find that a statement is improper, four factors are considered in determining whether the impropriety is flagrant: (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). Under [the] AEDPA, this bar is heightened by the deference we give to the . . . [Ohio] Supreme Court's determination of . . . [Petitioner's] prosecutorial-misconduct claims. *See Macias v. Makowski*, 291 F.3d 447, 453-54 (6th Cir. 2002)("If this court were hearing the case on direct appeal, we might have concluded that the prosecutor's comments violated Macias's due process rights. But this case is before us on a petition for a writ of habeas corpus. So the relevant question is not whether the state court's decision was wrong, but whether it was an unreasonable application of clearly established federal law.").

*Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003).

Reviewing the Second District's decision, the Court finds itself in complete agreement. It is perfectly proper for a prosecutor to remind the jury that a defendant has a compulsory process right to compel witnesses to attend and testify. There was no misconduct in this prosecutor's having done so and the Seventh Ground for Relief should therefore be dismissed.

**Conclusion**

In accordance with the foregoing analysis, it is respectfully recommended that the Petition herein be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should

certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should

not be permitted to proceed *in forma pauperis*.


June 25, 2015.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS


Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).